Now when the court calls the cases for oral argument, we would appreciate it if the attorneys for the parties would approach that podium and tell us who you are and who you would represent. I think they'll figure it out, I bet you. So anyway, please call the first case. 08-3655, you will represent Frederick Walker. My name is Robert Drizzen, I'm representing Frederick Walker. Very good, Mr. Drizzen. State? I am Assistant State's Attorney, Harina Megani-Wakely, representing the people. Okay, very good. Each side has 15 minutes, but we don't look at our watches in this division. Why don't you keep it lively and move it along? We'll listen to you. So anytime you're ready, Mr. Drizzen. You'll have 15 minutes, but again, you'll have time to reply as well. May it please this Court. Eight witnesses testified on each of the three days of trial on the other crimes of evidence. Eight witnesses out of a total of 32, more than one-third of the witnesses. How many of those eight, though, testified regarding the shooting itself as well, the shooting a day or two later? Of that, there was, well, Detective Turner gave over that. My client made a statement to him. But there were no one else testified directly as to the shooting. Well, did they not? I mean, were the people standing, then several civilians in the other gang, in this case the ones where Mr. Walker went over to shoot at the first day. Did they not testify to both incidents, the hitting of Mr. Walker, the shooting by Walker, the hitting of Walker, and then the shooting by Walker of other people later? There was no civilian witnesses were testified to both those incidents? I'm a bit confused. To my knowledge... Or maybe I'm getting my case confused. I'm a bit confused, Your Honor. In this case... I'm getting my case confused. I'm sorry. I'm sorry about that. I absolutely apologize. It runs together after a while. After 32 years. I apologize. Please continue. It's easier to do. The issues are the same, too. It's easier to do because the issues are common. Entirely my fault, though. Go ahead. I'm sorry. Well, in this case, Your Honor, eight witnesses testified as to the other crime incidents. More than one-third of the witnesses based on this. In this case, Your Honor, 120 pages out of a total of 700 pages of trial transcript were devoted to other crimes evidence. That's almost 20%. In this case, Your Honor, a long video including evidence of the other crimes evidence was presented to the jury. In this case, Your Honor, the judge only on two occasions gave a very overly broad limiting instruction as to how the evidence should be received. And finally, Your Honor, in this case, the prosecutor mentioned no less than seven times in his closing argument the evidence of the burglary. The uncharged offense. Your Honor, in this case, we intend to argue first that the extensive use of other crimes evidence here, both of the burglary and of the altercation of the police department, deprived my client of a fair trial. It consisted basically of an impermissible mini-trial of an uncharged offense, which permitted the jury to be completely confused as to what was going on here. And if there's time, we'll discuss the sentencing issue. Well, he left blood evidence at the time of the burglary as well, correct? Yes. And then he left semen evidence inside the victim's body on the second case. Yes. So there's no question he did both crimes, is there? Well, he denies that he did both. I mean, in his statement, which we – Well, while he does, in a trial I guess he did technically, in that he had the lawyer stand up and say he pleaded not guilty, right? Yes. He admitted in his statement evidence that he had done the burglary, but we submit that that statement was involuntary, that my client had an A.D.I.Q., and that, as he said, Detective Turner had a gun to his head. We know that in cases of people who've got diminished capacity, that stress of intensive police interrogation can come up with false statements. There's no question of that. You look at the cases you cite. Notably, Mary Bragg's is probably the leading case on it. I wrote Bragg's on the appellate court and reversed. She had an I.Q., I think, of 54, whereas this gentleman, using the term loosely, has an I.Q., I should say, of 80 to 78, which is dramatically different. He, unlike Ms. Bragg's, he could actually read not well at the fifth grade level. So in terms of diminished capacity, if we're going to say that people with an I.Q. of 80 or lower cannot give voluntary confessions, well, guess what? That would let a whole lot of criminals go. Well, Justice, in this case, which may be different than Bragg's, in this case my client is asserting that his statement was given involuntarily, in that he was subject to intense interrogation, a gun at his head. Let's go back to the gun at the head. About eight years ago, the defense bar and the state legislature convinced the state legislature we should videotape confessions, and they did. And even though the state's attorneys fought it like mad initially, I think they like it now. And the idea was, if I recall, having listened to a lot of this at the time, was that, boy, this will get rid of motions to suppress. If you see the guy, as cold-blooded as these people are, and having interviewed scores of murderers, they'll sit there and look you right in the eye and say, yeah, I killed him, and I'm glad I did. Kind of like Mr. Walker did. However, what we've seen, at least what I've seen up here, just speaking for myself, is that they do file motions to suppress, and they say, just off camera, there's a gun. Or just before the cameras turn on, the detective said these horrible things. And then, of course, they say in the legislature, we should tape from the time they get in the car, in which time, I assure you, having done this all of my life, that they will say, well, just out of the scene, there's a gun at his head while he's driving in the car. Isn't that a concern? Isn't that a legitimate concern of the courts that when they say a gun is at his head and it's videotaped and there's no gun against his head? Your Honor, the emperor has no clothes in this city. As a matter of fact, the judge here really wanted to get a lot of evidence in of the altercation to suppress any jury concern that my client was mistreated. My client said on video he was treated fine. But again, that videotape confession came almost 24 hours later after he had been taken into custody. And, you know, unfortunately, this city has a lot of shame with what happened in various police departments. That was Area 2 in the early 1980s. Yes. The Wilson brothers were tortured in 1983, if I remember being, 2, 83. So that's 31 years ago. The Midnight Crew, you know, first got fired 20 years ago. How about since then? It's 20 years. Well, I'm fortunate to have in the audience with myself Mr. Howard Wilson, Howard Winston, my boss, who is very much involved with it right now. Involved with it right now. It's an ongoing process. So I can't speak as to what's going on right now, but I do know in this case, my client said that Detective Turner held a gun at his head and told him what he had to say. And given his diminished capacity, perhaps that could have affected what was said. But that still wouldn't be wrong, right? What he said, what your client said, since the semen is in the dead woman's vagina, we know he had sex with her, right? Yes, we do. And so there's no question that he did that. The question could be, procedurally, were his rights violated? Because everybody has rights. They're rightfully so. The Constitution applies to the guilty just as it does to the innocent. And so that's the argument. It's not that he didn't do it. It is that, gosh, so what he said in his confession is largely corroborated by the physical evidence, as you know it. However, so the concern is not false confession as it would be with many of these cases. The issue is, were his rights violated? Was his will, was it voluntarily given? Or was his little bit of will, since he's slow, overcome? Well, on the other hand, Your Honor, one thing as a defense attorney is that we weren't present what happened. We were not present. My client never admitted in the statement, a video statement, that he had sex. It could have been, for all we know, it was voluntary. It could have been. We don't know. And she's unable to testify. Exactly. You know, let's be realistic here. The woman had a broken knife protruding from her neck. And that's, the inference that could be drawn from that is what? That it was consensual sex or that she was murdered? I would think it would be that she was murdered. But none. I just had to, it just seems so incongruous to me that you would say that the semen found in her vagina could have been from consensual sex when she was slashed in many parts of her body and had a broken knife protruding from her neck. I mean, I think the jury is expected to draw reasonable inferences from the evidence presented. And I would submit to you that a reasonable inference that can be drawn from that scenario is not that this woman had consensual sex with this person who pushed his way into her house. You know, I like you to make reasonable arguments, and that does not sound reasonable to me. So move on. In this case, the judge, going back to the other kind of evidence that we're talking about, the judge basically said that issues of defendant's presence, his intent, and motive and knowledge would be considered by the jury only for that limited purpose. But this was only said twice during trial and once during instructions, over eight witnesses and over 120 pages of transcript. The question is that what of these elements were proven or shown relevant by the evidence of the other crime's evidence or of the altercation? Presence, we know the defendant knew the house because it was the mother of his girlfriend and his common-law child. So why would that show the evidence of any more presence in there a week later? Intent, well, there was a specific intent to burglary. As a matter of fact, my client said in his statement that he went eight days before the killing to burglarize the house to take money, and he went there specifically when he knew that the victim wasn't there. So the intent to burglarize on one day doesn't really seem relevant to any specific intent to murder or commit criminal sexual assault. What about the testimony of the witnesses who saw him outside the house on the morning of the crime? You know, in the statement from one of them who basically suggested that he opened the door and pretended he was talking to the victim by asking her what she wanted from the store and pretended he was I mean, what about that? When we later find out that the victim is murdered in there, doesn't that sound is there an inference that a jury could draw from that, that this was all contrived to throw people off the track? Possibly. But there were some problems with that evidence. Mildred Neal and Eva Bass both testified that they saw a defendant outside a victim's home on the morning of June 22nd. Bass said that it was after 5.30 a.m. as she was getting to work, but then she admitted that she started work at 5 a.m. and would have left before that time. Mildred Neal said she didn't see a defendant come out until 7.30, so they got their times wrong with that. Isn't that the kind of thing that a jury I agree that there are certainly conflicts in their testimony, but that's the jury's function. I mean, they were listening to this evidence from these two witnesses, and the fact that the times may have been a little bit out of kilter, does that discredit the whole, all of their testimony? I think not. The jury gets to decide those conflicts. I mean, that's our system. So I agree that the times were not clear, but that's the jury function. What do we do with that? I agree it's a jury's function. I think one of the problems is that there was extensive evidence of another crime that happened eight days before that, of which one of the witnesses said that she saw the client there also, hanging around the apartment. So in the jury's mind, they're hearing a lot of evidence about this uncharged burglary, and what she's hanging around the apartment. And then there's conflicting evidence about a week later, they see him in the morning. I would think as a jury, I would be very confused. And with the amount of evidence given, if I wanted to find him guilty of burglary, maybe he just was a bad guy and also did the murder, too. Well, I'd be surprised if a state's attorney would take you, then, Mr. Dryson, as a potential juror. If you're telling me legitimately you're concerned about whether he did it or not, when there's his semen in the deceased woman's body, and she has multiple horrible wounds, there is her blood on his pants, and he gave a videotaped confession. Again, going back to what Justice Cunningham suggested, move on to your next argument, then, if you would. What else do you have today? Well, a lot was said that the defendant's confession confirmed that they put all this evidence in, to confirm his confession, because in his statement, he said he mentioned it. But that was never limited to the juror. The juror was not to say, listen to the evidence. But how do you prejudice? It goes back. To show that he was prejudiced by the evidence that a few days earlier, he had burglarized a place, which he absolutely did, and he confessed to doing, which he put in the videotaped confession, not the cops. To prevail on that issue, to have any hope of prevailing on that issue, don't you have to show that he was injured by this? He actually suffered actual prejudice. Isn't that difficult to do in a case where, again, the DNA evidence is overwhelming? He has videotaped confession. I did it. I'm glad. I can't wait. You know, how are you prejudiced, other than your theory that, as a juror, you'd be confused? Our Supreme Court said, in the case of Blue, that cumulative error creates a persuasive pattern of unfair prejudice. In this case, there was a lot of problems. One-third of the evidence presented, the witnesses and one-fifth of the trial testimony, dealt with another crime. The jury was poisoned in prejudice, and my sense is that if they would find him guilty of one, he was guilty of another. So in his mind, there was so much here, cumulative evidence, that just because there might be a bit of evidence showing that he was there or committed the crime, the jury was poisoned and he deserves a new trial on this issue. I'm going to agree with you on your point that there were a lot of things put in that shouldn't have been. But I would like you to address Justice Quinn's question, which he asked earlier. This isn't an issue of false confession. It's a question of whether or not the confession or the statement that he made, the inculpatory statement, was obtained under impermissible circumstances. That's the real issue. Explain that to me, why you think that this confession was obtained under impermissible and therefore inadmissible circumstances. The statement was suspect because the videotaped statement came out almost 24 hours after Laquan was taken custody. Dr. Gelbort testified that due to the defendant's limited capacity, he may not have knowingly waived it, and that with his diminished medical capacity, a jury could have found that he was subject to improper influence. We submitted our issue, too, and was raised below, that he did not voluntarily give the statement. And so if you get rid of the statement, there's a lot less evidence here that could have found Laquan guilty. It's time for your reply as well. Thank you so much. Thank you, Mr. Quinn. State. Good morning, Your Honor. Can you address Justice Cunningham's last question to Mr. Dreisen, or concern she has regarding evidence of his will being overborne? You know, why did the State have a need to throw in the kitchen sink, which is what it seems like you did here to me? You threw in a lot of stuff that under other circumstances and normal circumstances, if you follow the rules, shouldn't have been in there. Tell me why you found it necessary to do that. I'm asking you because I know you didn't try the case, but you're the only one here, so I'm asking you. Tell me. You put in a lot of stuff that had no business in this case, in my opinion. The other crimes evidence that you're referring to, the June 12th, was highly probative for the intent, motive, and identity in this case. And I would actually direct this court to people versus search, which is directly on point and supports the trial court's discretion. So it was an avalanche of other crimes evidence. The evidence that we put on was through, aside from the police officers, as well as the Assistant State's Attorney who testified regarding the defendant's statement themselves, there were only five witnesses aside from that who testified regarding the other crimes evidence. That was Mildred Neal, whose transcription pages took up only four pages of the 874 pages of the trial transcript, from opening statement to the jury finding of guilty. Officer Turner, whose took up only 10 pages out of the 874. Sergeant Nichols was the evidence technician who processed the scene. His was only 15 pages. The DNA experts together only took up 10 pages. I mean, in total, aside from the police officers who were testifying regarding defendant's given statement, which was voluntarily and knowingly given, aside from that, only 39 pages of this entire trial was dedicated or applied to this other crimes evidence. And it was properly allowed. The trial court properly exercised its discretion in allowing the people to introduce this evidence. And again – Why? Tell me why. I mean, just repeating that the trial court properly exercised its discretion is interesting, but it doesn't tell me why you think so. Why do you think that? Because it was highly probative not only for the intent and motive in this case, it was probative for the identity of the murderer at the crime scene, and it also showed a continuing hostility and volatile relationship. And again, I will direct this Court's attention to People v. Heard, which I submit to you is directly on point. In Heard, the defendant killed his ex-girlfriend. And he killed his ex-girlfriend because he was angry over the breakup. And the People introduced evidence of the fact that he had committed prior bad acts against her after the breakup. And one of the prior bad acts, which is pertinent to this case, was that he entered her apartment after they broke up and he stole her clothes. And that admission of that evidence was challenged on appeal. And the Supreme Court said that evidence was highly probative and correctly admitted because it went to the motive, the defendant's anger over the breakup, and that was the same reason that he stole those clothes. It went to the identity of the murderer, the fact that he had done this thing to this victim, and the fact that it showed hostility, continuing hostility towards the victim. And that case is directly on point because what this defendant did to this victim on June 12th is exactly what that defendant in Heard did with respect to stealing clothes. He broke into this victim's home. The victim he was angry about because she was shielding her grandchild because she wouldn't give up information about her grandchild. And so as defendant confessed in his statement, that's why he killed her because she wouldn't give me the information I wanted. And that's the same reason he went into the residence, her residence, not anybody else's residence, not just to steal money. He wanted to steal money from her, the woman that was keeping his grandchild from him. And he did this. He went in, he broke through the window, and he stole money from her in retaliation. It was the same motive, anger over the lack of information that she was not willing to give up over the son. And it showed the hostility towards the victim and the volatile relationship, and it also showed the identity of the murderer in this case. I mean, the court properly exercised its discretion in this case, and it weighed correctly the prejudicial versus the probative value. And here, I mean, basically, again, defendant's claim is that he was prejudiced because there was evidence. Well, any evidence that is properly going to be admitted is always going to be prejudicial to the defendant. That cannot be the standard. Also, it cannot be the standard that we actually have to introduce evidence in order to support it. We not only had to show that this crime occurred, the residential burglary, but we also had to show it was that this defendant actually committed it, and which is why we put on the witnesses that we did. None of these witnesses, insofar as the civilian witnesses aside from the officers and the assistant state's attorney, testified duplicative of each other. I mean, they testified to what they had to say. They were in, they were out, and that's it. And again, I would note that this was a minuscule piece of evidence against the defendant in face of the overwhelming evidence that showed his guilt, not only the videotaped statement, but it was the semen found in the victim. He confessed to his sister, I killed the victim. He also, there was blood, the victim's blood on his pants, and there was also eyewitnesses who saw him leaving from the house. I mean, in face of that overwhelming evidence, the other crime's evidence, properly admitted, but even if found to be not properly admitted, had no bearing on the ultimate outcome in this case, that defendant was guilty. I think you gave a good and detailed explanation, but that, you've come back around to my original question, which is, you know, in light of all of this evidence that you are very proud that you were able to put in, why throw in the kitchen sink? You know, you tried to answer, but I'm not convinced, so move on to something else. For those reasons, for that particular argument, the trial court was correct in allowing this evidence, and we would ask that that ruling be affirmed. With respect to defendant's challenge on the voluntariness of the statement, I mean, the trial court properly found that the statements were voluntary. It applied the correct test of totality of the circumstances here, and that those circumstances showed that there was no dispute he was given Miranda, and that defendant did, in fact, have the ability to understand and waive his Miranda. He was 28 years old, a convicted felon, had experience with the criminal system, as well as Miranda. He could speak, read, and write English, and he was not mentally retarded. Yes, he did have a reading deficiency, but all of the rights were read aloud to him, as well as before signing his waiver, that waiver was read also aloud to him. The trial court had the opportunity to watch the most relevant fact here, which was his videotaped statement, to see how was he acting when he was given these rights, and the trial court viewed the videotape and determined that there was no indication to the contrary that defendant was not understanding and actually waived his Miranda. In point of fact, defendant's own expert, Dr. Gelbort, watched the videotape and admitted there was no indication on that tape that defendant was not understanding or waiving his rights knowingly. There was no credible evidence of coercion. Yes, there was a claim that the detective held a gun, but that was specifically rejected by the trial court, and it was charged with determining that credibility determination, and that determination should only be overturned by this court if it was manifestly erroneous, and it was not. It was not a coercive atmosphere. He was not handcuffed. He was in custody for a little over 24 hours, but during that time he was only spoken to intermittently, and there was nothing to indicate any lack of understanding or knowing waiver in this case. And for those reasons, the trial court's conclusion that the statement was voluntary and knowingly made should be affirmed. In conclusion, for the reasons stated here, as well as those outlined in the People's Brief, the people would ask that the defendant's convictions and sins be affirmed in this case. Thank you. Mr. Dreisen, briefly. Your Honors, People v. Blue says that a defendant has a right to a fair trial, even if the evidence is overwhelming. We will submit that the evidence here is not overwhelming, and contrary to what the State has said, we counted 120 pages over the nine witnesses that testified here, each specifically about the burglary and what was done, 120 pages. In this case, the State also mentioned the People v. Heard in our reply brief, pages 7 to 9. We distinguished that. In Heard, there was a lot of evidence about violent acts of the defendant to the victim, not just prior burglary, things about ramming with his car, beating him up, et cetera. Certainly in that case, there was evidence that when there was violent acts and they tried to align together, even those acts were found to be improper. In our case, there were no prior violent acts. Doesn't that hurt you, though? The fact that they put in prior violent acts, isn't this about prejudice? Your concern is, number one, your argument, is that the jurors could be confused between the burglary and the rape-murder-home invasion, and also that they'd be so angry, prejudiced by the evidence of a burglary, that they'd be overcome with emotion and then hold this against them in a rape-murder-home invasion. In Heard, it is a litany of horrors, whereas here it's a burglary. Yeah, so they put in evidence he's a burglar. I don't know how that's terribly prejudicial to your client. Even without the evidence, I mean the overwhelming evidence of the murder-home invasion-rape, it's a burglary. Why would they get excited about that? It would have no relevance. And once they're finding him guilty on an uncharged offense, which basically was proven likely in the state of charge with that, they could just easily say, well, he's a bad guy, as well as the fact, the evidence also, which has not been mentioned, about his alleged punching his mother. He's a guy who's going to rob somebody, go burglarize someone's house, and then punch his mother. This is a bad man, and he obviously must have done something bad on the day in question. Thank you. Thank you very much. This case will be taken under advisement. Thank you.